**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** ) <br> ) <br> **Plaintiff,** ) <br> ) <br> v. ) <br> ) <br> **MICHAEL E. DIESEL,** ) <br> ) <br> **Defendant.** ) <br> ) | **Case No. 05-20005-01-JWL** <br> **08-2549-JWL** |

## MEMORANDUM & ORDER

In February 2006, a jury convicted Michael E. Diesel of willfully filing a false income tax return for tax years 1998, 1999, and 2000. Thereafter, the court sentenced Mr. Diesel to a 42-month term of imprisonment. Both his conviction and sentence were upheld on appeal. *United States v. Diesel*, No. 06-3325, 2007 WL 2181516 (10th Cir. July 31, 2007). This matter is now before the court on Mr. Diesel's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (doc. 113). For the reasons discussed below, the motion is denied.

**I.    Background**

This court adopts certain facts of this case from the Tenth Circuit's opinion resolving Mr. Diesel's direct appeal:

> Mr. Diesel founded and, through a series of trusts, effectively

> owned and operated a telecommunications research company which paid him an annual salary of $103,549 in 1998, $106,754 in 1999, and $108,788 in 2000. Mr. Diesel reported, and presumably paid, income tax on these amounts. In addition to his salary, however, Mr. Diesel's trusts also made over $3 million in distributions from 1998 to 2000, through a series of intermediate trusts, to the Pernour International Trust, an off-shore, Belize-based trust. Mr. Diesel controlled all of the trusts in the chain and ultimately received all of the proceeds from Pernour for his personal use. Mr. Diesel failed to pay income taxes on any of these proceeds.
>
> Mr. Diesel apparently learned how to devise this scheme from the Aegis Company in Chicago, which, following a nationwide investigation, the government successfully prosecuted for tax fraud. In January 1998, an undercover IRS agent at an Aegis seminar in Belize tape recorded Mr. Diesel stating that (1) any income tax above ten percent is "confiscation" and "everybody is trying to cheat" the IRS; (2) the "whole point" of the trusts he employed was that the IRS did not understand them; (3) the trusts are like a "Double K-1 disappearing tax liability trick"; and (4) the trusts were "too good to be true."
>
> Unfortunately for Mr. Diesel, they were not. In January 2005, a federal grand jury returned a three-count indictment against Mr. Diesel, charging him, *inter alia*, with three felony violations under 26 U.S.C. § 7206(1) for his willful filing of 1998, 1999, and 2000 tax returns that failed to report over $3 million of taxable income to him. Mr. Diesel elected to proceed to jury trial.

*Diesel*, 2007 WL 2181516, at *1. The jury found Mr. Diesel guilty on all three counts. Thereafter, Mr. Diesel moved the court for judgment of acquittal based on insufficiency of the evidence that the returns were false as to any material matter and that Mr. Diesel acted willfully in filing the false returns. The court denied the motion. Mr. Diesel's conviction and sentence were upheld by the Tenth Circuit. Mr. Diesel now claims that he received ineffective assistance of counsel from both his trial counsel and his appellate counsel.

## II.     Applicable Standard

To obtain relief under § 2255 on the grounds of ineffective assistance of counsel, Mr. Diesel must establish that his lawyer's performance was deficient as compared to an objective standard of reasonable performance. *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). "In applying this test, we give considerable deference to an attorney's strategic decisions and 'recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Bullock v. Carver*, 297 F.3d 1036, 1044 (10th Cir. 2002) (quoting *Strickland*, 466 U.S. at 690).

Mr. Diesel must also prove that counsel's deficient performance prejudiced his defense, "depriving him of a fair trial with a reliable result." *United States v. Orange*, 447 F.3d 792, 796 (10th Cir. 2006) (citing *Strickland*, 466 U.S. at 687). To satisfy the prejudice prong, Mr. Diesel must show that there is a reasonable probability that but for counsel's alleged errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

Because Mr. Diesel "must demonstrate both *Strickland* prongs to establish his claim, a failure to prove either one is dispositive." *Orange*, 447 F.3d at 796-97 (citing *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000) (quoting *Strickland*, 466 U.S. at 697) ("The performance component need not be addressed first. 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect

will often be so, that course should be followed.'"); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.")).

### III. The Stipulation

Prior to trial, Mr. Diesel filed a motion in limine seeking to exclude inflammatory evidence concerning "his purchases" of various jets and yachts during the tax years in question.[1] To resolve the issue, the parties ultimately agreed to stipulate to certain facts and the stipulation was presented to the jury. In pertinent part, the stipulation executed by Mr. Diesel stated that "Mr. Diesel effectively controlled the use and disposition of [trust] funds for his own purposes." Although Mr. Diesel concedes in his § 2255 motion that it was a "strategic" decision to enter into the stipulation, he now complains that the language of the stipulation was "disastrous" and "misleading" through the fault of his counsel. The argument is rejected.

During negotiations concerning the drafting of the stipulation, counsel for the government proposed that the stipulation include the sentence "Mr. Diesel effectively controlled the use and disposition of [trust] funds for his own purposes." According to Mr. Diesel, the phrase "for his own purposes" was intended by the parties to reflect that Mr. Diesel controlled the use and disposition of the trust funds "in his capacity as

---

[1]As reflected in Mr. Diesel's affidavit, income from various trusts was also spent on luxury cars, which Mr. Diesel drove, and various homes, in which Mr. Diesel resided.

4

trustee" to fund the expansion of the trust's business. Contrary to Mr. Diesel's interpretation of the phrase, counsel for the government repeatedly suggested to the jury, without objection by defense counsel, that Mr. Diesel had stipulated to use of the funds "for his own *personal* purposes." Mr. Diesel's complaint, then, is that the phrase "for his own purposes" was ambiguous and required clarification by his counsel either at the drafting stage or, at a minimum, to the jury at trial.

With respect to his counsel's assistance at the drafting stage, Mr. Diesel asserts that his lead counsel, Michael Minns, did not assist in drafting the stipulation in any respect and left Mr. Diesel to draft the stipulation on his own. The record belies Mr. Diesel's assertion. The evidence before the court demonstrates that counsel for the government proposed the first draft of the stipulation and that subsequent changes to that draft were made by both defense counsel (with input from Mr. Diesel) and government counsel. While Mr. Diesel's lead counsel did not offer any suggestions concerning the stipulation, he received each and every e-mail concerning the draft and suggested revisions and, presumably, would have offered any suggestions he deemed appropriate. Moreover, Robin Fowler, co-counsel for Mr. Diesel, was actively involved in the drafting of the stipulation, including the suggestion of revisions to the draft.

Mr. Diesel complains that he hired his lead counsel based on his extensive expertise in criminal tax cases and contends that Mr. Fowler lacked any expertise in "complicated" tax issues such that the lack of active involvement from his lead counsel prejudiced Mr. Diesel. The court, however, is personally familiar with Mr. Fowler and

5

knows him to be well versed in criminal law and a competent and capable trial lawyer. In addition, Mr. Fowler has submitted an affidavit in which he avers that he has specific experience handling criminal tax cases. Mr. Diesel, then, has not shown that he received ineffective assistance of counsel due to the alleged unavailability of his lead counsel. *See Bucklew v. Luebbers*, 436 F.3d 1010, 1019 (8th Cir. 2006) (rejecting ineffective assistance claim based on lead counsel's lack of participation in certain aspects of penalty phase of trial because another member of defense team participated fully and concluding "it is not deficient performance for a team of attorneys to divide among them the workload of a case in a rational and efficient manner.); *McDougall v. Dixon*, 921 F.2d 518, 535, 539 (4th Cir. 1990) (rejecting ineffective assistance of counsel claim based on lead counsel's conduct and alleged errors where evidence demonstrated that lead counsel was "but one of three attorneys" representing the defendant and review of the "complete legal advice and services [defendant] received from the defense team representing him" revealed that he did not receive ineffective assistance, and noting co-counsel was "an experienced criminal trial lawyer" who provided adequate representation when required, at the last minute, to step in for lead counsel in the examination of witnesses).[2]

Moreover, Mr. Diesel cannot show that his lead counsel, if he had been more involved in the drafting of the stipulation, would have succeeded in proposing to the

---

[2] For these same reasons, the court rejects Mr. Diesel's more general assertions (set forth in his affidavit) concerning Mr. Minns' unpreparedness for trial.

6

government that the phrase "for his own purposes" should be "clarified" to read "in his capacity as trustee." Contrary to Mr. Diesel's contention, the record in no way supports the conclusion that the phrase "for his own purposes" was intended by the government to reflect that Mr. Diesel controlled the use and disposition of the trust funds "in his capacity as trustee." According to the various e-mail exchanges among counsel and Mr. Diesel, the government proposed the phrase "for his own purposes" to clarify that Mr. Diesel "did not use [the funds] for the benefit of Pernour." Because the government believed that its evidence supported the conclusion that Mr. Diesel did not use the trust funds for the benefit of the trust, it would not have agreed to a stipulation that Mr. Diesel had, in fact, used the funds in his capacity as trustee.

In the absence of an agreement on that phrase, the jury would have heard evidence that trust funds were used to purchase jets, yachts, houses, and luxury cars that Mr. Diesel admittedly used. According to Mr. Diesel, he would have been better off for the jury to hear this evidence as opposed to the "misleading" stipulation because he could have "easily explained" to the jury that none of these assets were titled in his name. The houses and cars were owned by other Diesel trusts. The jets and yachts were purchased by unrelated entities with money loaned by Mr. Diesel "in his capacity as trustee" and those entities held the title to the assets and leased those assets back to Mr. Diesel. But the mere fact that Mr. Diesel did not hold the title to these assets does not mean that he did not use the funds for his own personal purposes. Indeed, he admits in his submissions that he drove the cars owned by the trusts, that he resided in the homes

owned by the trust, and that he used the yachts for "his personal use." He has not identified any benefit that Pernour received based on his use of the funds in this manner. Mr. Diesel, then, has not shown that the government would have been amenable to a stipulation that indicated that Mr. Diesel used trust funds in his capacity as trustee and he has not shown that he would have been in a better position had the jury heard evidence concerning how the funds were used. In short, he has not shown that his counsel was ineffective in drafting the stipulation or permitting Mr. Diesel to agree to the stipulation.

For these same reasons, Mr. Diesel has not shown that his counsel erred in failing to object to the government's suggestion to the jury that Mr. Diesel had stipulated to using the funds "for his own personal purposes." As the evidence surrounding the drafting of the stipulation demonstrates, the government's interpretation at trial of the phrase "for his own purposes" was entirely consistent with what the government intended that phrase to mean (that Mr. Diesel "did not use [the funds] for the benefit of Pernour") when it proposed the addition of the phrase during negotiations. To be sure, the government had ample evidence supporting the conclusion that Mr. Diesel used trust funds for his own personal purposes and, absent the stipulation, the jury would have heard that evidence. The government's suggestion, then, that Mr. Diesel used the funds for his own personal purposes was simply not objectionable.

**IV.    Funds "Distributed" to or "Credited" to Pernour**

8

As reflected in the stipulation executed by Mr. Diesel, the tax returns filed by Diesel Business Trust (DBT) reflected a deduction for amounts "distributed" to Pernour despite the fact that those amounts were never actually distributed to Pernour. Throughout trial, the government highlighted (in argument and through the testimony of witnesses) that no funds from DBT were ever "distributed" to Pernour. According to Mr. Diesel, the government's repeated use of the term "distributed" inappropriately suggested that the funds were required to "change hands" when, in fact, the tax code permits an estate or trust to reduce its tax liability by *either* distributing *or* crediting its taxable income to the beneficiaries of the trust.[3] For purposes of his motion to vacate, then, Mr. Diesel contends that his counsel should have objected to the government's suggestion that DBT was required to "distribute" the funds to Pernour and should have clarified to the jury that the tax code permits DBT to "credit" the funds to Pernour.[4]

The argument is rejected. As an initial matter, the distinction that Mr. Diesel

---

[3] In support of his assertion that the tax code provides an estate or trust the option of either distributing or crediting its taxable income, Mr. Diesel directs the court to 26 § U.S.C. 661(a)(2), which states that, in any taxable year, "there shall be allowed as a deduction in computing the taxable income of an estate or trust" the sum of "any other amounts properly paid or credited or required to be distributed for such taxable year."

[4] Mr. Diesel asserts his alleged good faith belief, based on his understanding of the Aegis system, that DBT, by electing to "credit" certain income to Pernour rather than "distribute" that income to Pernour, was not required to actually pay (or "distribute") that income to Pernour at any time. Rather, DBT could simply credit its income to Pernour by preparing a Schedule K-1, then Pernour would report that income on its United States tax return, and then Mr. Diesel, according to his asserted belief, was free to "spend the money as he saw fit in his capacity as trustee."

9

attempts to draw between a "distribution" and a "credit" is irrelevant for purposes of what the jury was asked to decide in this case. As succinctly noted by the Tenth Circuit in resolving Mr. Diesel's direct appeal,

> This case had nothing to do with when or how Mr. Diesel's various trusts made, credited, or reported distributions. As we have already indicated, it had everything to do with Mr. Diesel's under-reporting of his personal income on his *own* personal income tax return.

*United States v. Diesel*, 2007 WL 2181516, at *3 (10th Cir. July 31, 2007). In other words, the fact that DBT elected to "credit" the funds to Pernour does nothing to undermine the fact that Mr. Diesel used those funds for his own purposes and failed to report those funds on his personal income tax returns.

In any event, the government's use of the term "distributed" was not misleading and was, in fact, accurate. As reflected on DBT's 1998 U.S. Income Tax Return for Estates and Trusts, Form 1041, the income credited to Pernour was entered on Schedule B and Schedule B is entitled "Income Distribution Deduction." More specifically, the income credited to Pernour was entered on Line 10 of that Schedule; Line 10 reads "Other amounts paid, credited, or otherwise required to be distributed." As the form makes clear, then, amounts that are properly "credited" are required to be "distributed." Indeed, the stipulation executed by Mr. Diesel supports this conclusion:

> [DBT's tax return] included a deduction for a distribution of $335,500 to Pernour International Trust ("Pernour"). DBT credited Pernour with $335,500; those funds have not been distributed to Pernour.

Mr. Diesel has not shown, then, that the government misled the jury by highlighting that

no funds were "distributed" to Pernour and he was not prejudiced by his counsel's failure to object to the use of that term.

## V.     Defenses Based on Mr. Diesel's "Good Faith"

Mr. Diesel next complains that his counsel failed to present adequately to the jury two defenses to the element of willfulness–Mr. Diesel's alleged good faith misunderstanding of the law and his alleged good faith reliance on the advice of counsel. The court rejects this argument. To begin, the jury was instructed on both defenses.[5] Instruction No. 15 advised, in pertinent part, that "Mr. Diesel's conduct is not 'willful' if it resulted from . . . a good faith misunderstanding that he was not violating a duty that the law imposed on him."     Instruction No. 16 explained the "good faith misunderstanding" defense in detail. Instruction No. 17 explained the "good faith reliance on advice of counsel" defense.

With respect to his alleged good faith misunderstanding of the law, Mr. Diesel urges that he believed in good faith, based on his understanding of the Aegis system, that DBT could simply "credit" its income to Pernour by preparing a Schedule K-1 form, that Pernour would then report that income on its United States tax return, and that Mr. Diesel was then free to "spend the money as he saw fit in his capacity as trustee" without

---

[5]Although Mr. Diesel's alleged "good faith" is a defense to willfulness, the jury was instructed that Mr. Diesel was not required to prove his good faith and that the government, having the burden to prove Mr. Diesel acted willfully as charged, had the burden of proving that Mr. Diesel did not act in good faith.

11

DBT ever having to actually distribute any income to Pernour. According to Mr. Diesel, his counsel never "hammered these points home" and, accordingly, his performance was constitutionally deficient.

Mr. Diesel cannot establish this ineffective assistance of counsel claim for two reasons. First, as already indicated by the Tenth Circuit, the issue presented to the jury "had nothing to do with when or how Mr. Diesel's various trusts made, credited, or reported distributions." *Diesel*, 2007 WL 2181516, at *3. The issue presented to the jury was whether Mr. Diesel under-reported "his personal income on his *own* personal income tax return." *Id*. Second, even assuming that Mr. Diesel believed in good faith that DBT could credit its income to Pernour without distributing that income and that Mr. Diesel was then free to spend the income "in his capacity as trustee," Mr. Diesel has not shown that he spent the income "in his capacity as trustee." In fact, he stipulated that he used the funds "for his own purposes." His counsel, then, was not unreasonable in failing to present to the jury the specific defense described by Mr. Diesel.

With respect to his alleged good faith reliance on the advice of counsel, Mr. Diesel first complains that his counsel's performance was constitutionally deficient because his trial counsel failed to interview or call as a witness at trial Richard Cimino, an attorney who advised Mr. Diesel "on the legality of the Aegis system" for tax years 1998 and 1999. This argument is rejected. Even assuming that his counsel failed to interview Mr. Cimino, Mr. Diesel has not shown how that failure has prejudiced him. Significantly, Mr. Diesel has submitted an affidavit from Mr. Cimino in which Mr.

12

Cimino discusses generally the advice he provided to Mr. Diesel concerning the Aegis system. In full, Mr. Cimino avers:

> I recall Mr. Diesel asking me to review some trust documents that were sent to him by and [*sic*] attorney and accountant in Chicago. The proposed documents called for a trust to be established naming an offshore trustee with Mr. Diesel relinquishing all ownership of the assets he would transfer to the trust. Mr. Diesel was particularly concerned about the tax effects of the transaction. I recall writing to request opinions from the attorney and accountant who had sent the documents to Mr. Diesel. As I recall, they did respond with assuring opinions to the effect that the transfers to trust would be given favorable tax treatment under our tax laws. I passed this information on to Mr. Diesel.

The affidavit, then, is significant for what it does not say. Mr. Cimino does not state that he advised Mr. Diesel that he could lawfully use income from the trust for his own purposes and Mr. Diesel does not state that he sought or received advice from Mr. Cimino (or any other attorney) that he could lawfully utilize trust funds for his own benefit or treat that income as income personal to him. Of course, the jury's verdict that Mr. Diesel willfully failed to report his personal income on his personal income tax returns means that the jury concluded that Mr. Diesel used the income from the trust as personal income. Mr. Diesel has come forward with no evidence that any lawyer advised him that he could lawfully do so. Thus, even assuming Mr. Cimino testified consistent with his affidavit, that testimony would not support a defense that Mr. Diesel, in good faith, relied on Mr. Cimino's advice.

Mr. Diesel also contends that he received ineffective assistance of counsel in connection with the presentation of a reliance-on-advice-of-counsel defense because Mr.

13

Diesel's sole witness, attorney Scott Gross, testified that, once he concluded that the Aegis system was unlawful, he advised Mr. Diesel not to file amended tax returns because the IRS was already auditing Mr. Diesel's returns and the returns were "essentially already being amended through the process of the audit." According to Mr. Diesel, if he had filed amended returns, then he would have been "completely exonerated" and his counsel should have highlighted through the examination of Mr. Gross that Mr. Diesel relied to his detriment on Mr. Gross's advice not to file amended returns.

Critical gaps in the evidence, however, are fatal to this claim. First, contrary to Mr. Diesel's characterization of Mr. Gross's testimony, Mr. Gross did not testify that he advised Mr. Diesel not to file an amended return. Although Mr. Gross testified that his general strategy, after concluding that the Aegis system was unlawful, was to have his tax clients, including Mr. Diesel, "deal with audits as they came up rather than amending returns," he testified that he could not recall discussing those different options with Mr. Diesel. Rather, he simply recalled that they had decided to go "full steam ahead with the audit." Second, even assuming that Mr. Gross advised Mr. Diesel not to file amended returns, it is unclear to the court how defense counsel would have elicited from Mr. Gross evidence that Mr. Diesel relied on that advice. As Mr. Gross testified, he had no knowledge of whether Mr. Diesel ever relied on any advice provided to him by Mr. Gross. Third, again assuming that Mr. Gross advised Mr. Diesel not to file an amended return, there is simply no evidence in the record–including the affidavit filed by Mr.

14

Diesel with his motion–that Mr. Diesel elected not to file an amended return because he was relying in good faith on the advice of Mr. Gross.  It may well be that Mr. Diesel elected not to file amended returns because he feared that amended returns would serve as an admission of guilt and he held out hope that he could convince the IRS that his original returns did not contain false statements.  In short, Mr. Diesel has not established that his counsel's performance concerning the examination of Mr. Gross was unreasonable.

Finally, Mr. Diesel complains that his counsel's performance was constitutionally deficient because the advice-of-counsel instruction tendered by defense counsel and provided to the jury misstated the law.  The instruction, Instruction No. 17, advised the jury, in pertinent part, that "[g]ood faith reliance on advice of an attorney is one factor you may consider when determining whether Mr. Diesel acted willfully." According to Mr. Diesel, the instruction erroneously advises that good faith reliance on the advice of counsel is simply a factor for the jury's consideration when, in fact, good faith reliance on the advice of counsel fully negates willfulness.  While the court concludes, upon reflection, that the instruction might leave some question as to the appropriate standard,[6] Mr. Diesel's claim nonetheless fails because he cannot establish any prejudice resulting from the instruction.  As explained above, the jury concluded that Mr. Diesel treated

---

[6]A more accurate instruction would have explained that "reliance on advice of an attorney is one factor you may consider" in assessing willfulness, but a finding of "good faith reliance" negates the element of willfulness.  *United States v. Thomas*, 1993 WL 53600, at *14 & n.8 (10th Cir. Feb. 23, 1993)

15

income from the trust as income personal to him and there is no evidence that Mr. Diesel relied on the advice of counsel in deciding to do so. Thus, even assuming that Mr. Diesel's counsel erred in tendering Instruction No. 17, there is no reason to believe that the jury would have acquitted Mr. Diesel on an advice-of-counsel defense had it been instructed that good faith reliance on the advice of counsel fully negates willfulness.[7]

## VI.    Jury Instruction No. 14

Mr. Diesel next contends that his counsel should have objected to Instruction No. 14 because the instruction misstates the facts of the case. Instruction No. 14 read as follows:

> Income derived from any source whatever is included in gross income for the purpose of determining taxable income.
>
> You have heard evidence that Mr. Diesel was a trustee of and received cash or other property from a trust, the Diesel Business Trust. If you find beyond a reasonable doubt that Mr. Diesel was a trustee of Diesel Business Trust and obtained cash or other property from that trust, then you should proceed to determine whether this was income to Mr. Diesel.
>
> In this connection, the question for you to determine is whether Mr. Diesel had control over the cash or other property he obtained from that trust, took it as his own, and treated it as his own, so that as a practical matter he derived economic value from the money or property he received. If you find beyond a reasonable doubt this to be the case, then the money

---

[7]In a related vein, Mr. Diesel complains in his affidavit that his counsel failed to call as a witness at trial a "tax expert" whom counsel had hired two weeks prior to trial. Mr. Diesel, however, fails to explain what the proposed testimony of this expert might have been and how that testimony would have changed the outcome of the case. Just as he has not shown that any attorney ever advised him that he could lawfully utilize trust income for his own purposes without reporting that income as personal to him, he has not shown that any "tax expert" would testify that such conduct was lawful.

>or property received by Mr. Diesel would be income and should have been reported on his personal income tax returns; if you do not find this to be the case, then the money or property obtained by Mr. Diesel would not be income to him.
>
>If you should determine that income was not reported on Mr. Diesel's tax return which should have been reported, you must determine whether this was done willfully.

According to Mr. Diesel, the instruction, by referencing "evidence that Mr. Diesel was a trustee of and received cash or other property from a trust," erroneously advised the jury that Mr. Diesel "actually received" cash and/or property from the trust when, in fact, there was no evidence of any checks made payable to Mr. Diesel for the funds, no evidence of any deposits of the funds into Mr. Diesel's personal bank account, no evidence of any assets purchased with the funds that were titled in Mr. Diesel's name, and no evidence of any expenses personal to Mr. Diesel that were paid with the funds.

Contrary to Mr. Diesel's characterization of the language in Instruction No. 14, that instruction did not advise the jury that Mr. Diesel maintained funds from the trust in his own name and the jury was not asked to determine whether he maintained funds from the trust in his own name. Rather, the instruction appropriately focused the jury's attention on whether Mr. Diesel treated funds from the trust "as his own" such that "he derived economic value" from those funds. In that regard, the instruction's reference to "evidence that Mr. Diesel was a trustee of and received cash or other property from a trust" was fully supported by the facts of the case, including the stipulation executed by Mr. Diesel in which he conceded that he controlled the use and disposition of funds from

17

the trust for his own purposes. In short, then, defense counsel's failure to raise the meritless argument that the instruction suggested to the jury that Mr. Diesel maintained funds from the trust in his own name does not constitute deficient performance. *See Boyle v. McKune*, 544 F.3d 1132, 1140 (10th Cir. 2008).[8]

For the foregoing reasons, the court rejects each of Mr. Diesel's ineffectiveness claims concerning his trial counsel.[9]

---

[8] Mr. Diesel also complains that Instruction No. 14 "eliminated the constitutional obligation of the jury to determine whether or not there was a constructive dividend," and that no reasonable jury, if given the proper instruction, could have concluded that Mr. Diesel treated the income from the trusts as a constructive dividend which, as argued by Mr. Diesel, "was the government's whole case." Mr. Diesel is incorrect. The government never presented its "constructive dividend" theory to the jury–it presented the issue to the court for the first time in response to Mr. Diesel's Rule 29 motion and in connection with discussing with the court the most appropriate way to instruct the jury concerning the case. Indeed, the jury was never instructed on the issue of constructive dividends because the court believed that the constructive dividend theory was inconsistent with the way in which the government had prosecuted the case. Ultimately, then, the jury was provided instructions consistent with the way in which the government had prosecuted the case.

[9] In his affidavit, Mr. Dieselasd makes an additional complaint concerning his trial counsel. Because Mr. Diesel has not raised this complaint in the motion itself, it is unclear to the court whether he intends to assert the complaint as a separate claim for relief. Nonetheless, the court addresses the complaint in an abundance of caution. According to Mr. Diesel, one of the government's witnesses, Paul Baker (formerly employed by Mr. Diesel), "testified to a number of things that just weren't true" in light of a "crippling stroke" that significantly impaired Mr. Baker's memory. Mr. Diesel contends that he asked his trial counsel to have Mr. Baker, prior to trial, examined by an independent psychiatrist to ascertain whether Mr. Baker's testimony would be reliable and to move to exclude his testimony upon a finding of unreliability.

Mr. Diesel's claim lacks merit. To begin, Mr. Diesel directs the court to no authority permitting him to have a witness submit to a psychiatric examination and the
(continued...)

## VII.    Appellate Counsel

Mr. Diesel's final claim is that his appellate counsel was constitutionally deficient for failing to challenge on appeal this court's denial of Mr. Diesel's motion for judgment of acquittal based on insufficiency of the evidence that Mr. Diesel's income tax returns contained false statements as to any material matters. As highlighted by Mr.Diesel, this court, in denying the motion, measured the sufficiency of the evidence by looking to Jury Instruction No. 14 coupled with, in large part, the stipulation executed by Mr. Diesel. Reiterating his arguments that Instruction No. 14 was erroneous and that the stipulation was "misleading," Mr. Diesel contends that this court's order relying on Instruction No. 14 and the stipulation would likely have been reversed by the Tenth Circuit on appeal if his appellate counsel had challenged it.  For the same reasons that the court has already rejected Mr. Diesel's arguments concerning Instruction No. 14 and the stipulation, the court rejects the argument that a challenge to the court's denial of the motion for judgment of acquittal would have been meritorious. *Smith v. Workman*, 550 F.3d 1258, 1268 (10th Cir. 2008) (appellate counsel need not raise meritless issues and petitioner must show "a reasonable probability that the omitted claim would have resulted in

---

⁹(...continued)
court is aware of none.  While a district court is permitted by statute to order a defendant in a criminal case to submit to a psychiatric examination, *see* 18 U.S.C. § 4241, that statute does not extend to witnesses in the case.  Mr. Diesel, then, has not shown that his counsel unreasonably refused to seek a psychiatric evaluation of Mr. Baker.  Moreover, any damaging testimony provided by Mr. Baker (testimony concerning Mr. Diesel's use of trust income) was cumulative of evidence from other sources.  Thus, Mr. Diesel has not shown that he suffered prejudice as a result of Mr. Baker's testimony.

19

relief").

**IT IS THEREFORE ORDERED BY THE COURT** that Mr. Diesel's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255 (doc. 113) is denied.

**IT IS SO ORDERED** this 24th day of March, 2009.

>  s/ John W. Lungstrum
>  John W. Lungstrum
>  United States District Judge